Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued October 22, 2007       Decided December 7, 2007

No. 06-5382

JEFFERSON MORLEY,
APPELLANT

v.

CENTRAL INTELLIGENCE AGENCY,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 03cv02545)

———

*James H. Lesar* argued the cause and filed the briefs for appellant.

*John C. Truong*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Jeffrey A. Taylor*, U.S. Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney.

Before: HENDERSON, ROGERS and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: Journalist Jefferson Morley appeals the grant of summary judgment to the Central Intelligence Agency ("CIA") on his request under the Freedom of Information Act ("FOIA") for documents pertaining to George Joannides, a deceased CIA officer. Although the CIA disclosed some records, it withheld others pursuant to various FOIA exemptions. On appeal, Morley contends that the CIA did not conduct an adequate search or provide an adequate *Vaughn* index and that it failed to meet its burden to justify withholding documents under FOIA exemptions. Upon *de novo* review, we reverse the grant of summary judgment. We hold that Morley met his burden to show that his request falls within an exception to the Central Intelligence Agency Information Act of 1984 ("CIA Act"), 50 U.S.C. § 431(c)(3), and we remand the case so that the CIA may search its operational files in response to Morley's FOIA request. Additionally, its release of records pursuant to the John F. Kennedy Assassination Records Collection Act of 1992 ("JFK Act"), 44 U.S.C. § 2107 note, does not relieve the CIA of its obligations under the FOIA. On remand, the CIA must also expand its description of the search by its component units and supplement its justification for withholding documents under FOIA Exemptions 2, 5 and 6.

## I.

On July 4, 2003, Morley submitted a FOIA request to the CIA for "all records pertaining to CIA operations officer George Efythron Joannides (also known as 'Howard,' 'Mr. Howard' or 'Walter Newby')." Letter from Jefferson Morley to Katherine Dyer, Information and Privacy Coordinator, CIA (July 4, 2003) ("2003 Letter"), at 1. Morley is a journalist and news editor who has written about the assassination of President Kennedy. In his view, information on Joannides could shed new light on the assassination because of Joannides' position as the CIA case

officer for the anti-Castro organization known as the *Directorio Revolucionario Estudantil* ("DRE") in 1963. As Morley's writing discusses, the DRE had contact with Lee Harvey Oswald in the months before President Kennedy's assassination. Disclosure of CIA records pursuant to his FOIA request will, Morley contends, help to "complete the historical record of Kennedy's assassination, specifically CIA operations that might have collected intelligence on Oswald." Appellant's Br. at 3.

The CIA sent Morley a preliminary response on November 5, 2003, informing him that "CIA records on the assassination of President Kennedy have been re-reviewed under the classification guidelines for assassination-related records of the [JFK Act]" and that such records "have been transferred to the National Archives and Records Administration ("NARA") in compliance with this Act." Letter from Robert T. Herman, Information and Privacy Coordinator, CIA, to Jefferson Morley, at 1 (Nov. 5, 2003). The CIA directed Morley to submit his request to NARA, supplied him with NARA's address, and advised him that records can be electronically searched through NARA's website. *Id.* at 2.

On December 16, 2003, Morley filed a complaint for injunctive relief, requesting the district court to order the CIA to make available all documents responsive to his FOIA request. The CIA filed a motion to stay the proceedings pending its further processing of Morley's FOIA request, which the district court granted on September 2, 2004. By letter of December 22, 2004, the CIA responded to Morley's FOIA request, enclosing three documents in their entirety and 112 documents with redactions pursuant to FOIA Exemptions 1, 2, 3, 5, 6, 7(C), and 7(E). The CIA noted that it had located additional responsive material that it was withholding in its entirety under FOIA Exemptions 1, 3, and 6. It also explained that two documents required consultation with another agency and that 78 documents previously released under the JFK Act were on file with NARA. The CIA asserted that it could "neither confirm nor deny the existence of records responsive" to Morley's

request pertaining to Joannides' participation in any covert operation. Letter from Scott Koch, Information and Privacy Coordinator, CIA, to Jefferson Morley, at 2 (Dec. 22, 2004) ("2004 Letter"). The CIA later released the two documents requiring consultation with another agency in segregable form. Three months later, on May 9, 2005, the CIA sent Morley a partially redacted document that it had "inadvertently failed to include" in its earlier response and identified additional material that was withheld in its entirety under Exemptions 1, 2, 3, 5, 6, 7(C), 7(D), and 7(E). Letter from Scott Koch, Information and Privacy Coordinator, CIA, to Jefferson Morley (May 9, 2005).

Morley sought discovery from the CIA on February 27, 2005. After the CIA filed a motion for a protective order on March 24, 2005, the district court referred all discovery disputes to a magistrate judge. The CIA filed a motion for summary judgment on November 15, 2005. On February 6, 2006, the magistrate judge granted the CIA's motion for a protective order and directed Morley to file his opposition to the CIA's summary judgment motion, which Morley did on March 14, 2006 along with a cross-motion for summary judgment. On September 29, 2006, the district court granted the CIA's motion for summary judgment and denied Morley's cross-motion. It found that the CIA had conducted an adequate search, giving deference to the agency's decisions as explained in the October 26, 2005 Declaration of Marilyn A. Dorn, the Information Review Officer for the Directorate of Operations of the CIA ("Dorn Declaration"), and that the Dorn Declaration and the CIA's *Vaughn* index had adequately justified invocation of the claimed FOIA exemptions. Morley appeals, and we review the grant of summary judgment *de novo*. *See Iturralde v. Comptroller of Currency*, 315 F.3d 311, 313 (D.C. Cir. 2003).

## II.

Congress enacted the FOIA in order to "'pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny.'" *Dep't of Air Force v. Rose*, 425 U.S. 352, 361

(1976) (quoting *Rose v. Dep't of Air Force*, 495 F.2d 261, 263 (2d Cir. 1974)).  To prevail on summary judgment, then, the defending "agency must show beyond material doubt [] that it has conducted a search reasonably calculated to uncover all relevant documents."  *Weisberg v. U.S. Dep't of Justice*, 705 F.2d 1344, 1351 (D.C. Cir. 1983).  "The court applies a 'reasonableness' test to determine the 'adequacy' of a search methodology, consistent with congressional intent tilting the scale in favor of disclosure," *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 27 (D.C. Cir. 1998) (quoting *Weisberg*, 705 F.2d at 1351), and "impose[s] a substantial burden on an agency seeking to avoid disclosure" through the FOIA exemptions, *Vaughn v. Rosen*, 484 F.2d 820, 828 (D.C. Cir. 1973).  As such, exemptions from disclosure must be narrowly construed, *id.* at 823, and "'conclusory and generalized allegations of exemptions' are unacceptable," *Founding Church of Scientology of Wash., D.C., Inc. v. Nat'l Sec. Agency*, 610 F.2d 824, 830 (D.C. Cir. 1979) (quoting *Vaughn*, 484 F.2d at 826).

### A.  Standard

As a threshold matter, we conclude that the CIA properly processed Morley's request under the traditional standards of the FOIA, rather than the less restrictive standards of the JFK Act. In enacting the JFK Act, Congress declared that "all Government records concerning the assassination of President John F. Kennedy should carry a presumption of immediate disclosure," in part because the FOIA, "as implemented by the executive branch, has prevented the timely public disclosure" of these records.  JFK Act § 2(a)(2), (a)(5).  The JFK Act required that all assassination records be transmitted to NARA to comprise its JFK Assassination Records Collection.  *Id*. § 4. The JFK Act also established the Assassination Records Review Board ("Review Board") to determine whether agency documents constitute assassination records and to render decisions on whether a particular record qualifies for postponement of disclosure.  *Id*. § 7(i).  Upon expiration of the Review Board's operations on September 30, 1998, the CIA, NARA, and the Review Board signed a Memorandum of

Understanding ("MOU") providing that the CIA will transmit to the JFK Collection at NARA a number of specifically identified documents, along with "[a]ny other non-duplicate assassination-related records created or discovered by the CIA after September 30, 1998." Memorandum of Understanding Regarding Continuing Obligations of the CIA Under the JFK Act, at 3 (Sept. 30, 1998).

In *Assassination Archives & Research Center v. Department of Justice*, 43 F.3d 1542, 1544 (D.C. Cir. 1995) ("*AARC I*"), the court determined that "[t]he JFK Act and the FOIA are separate statutory schemes with separate sets of standards and separate (and markedly different) enforcement mechanisms. There is no evidence that Congress intended that the JFK Act standards be applied to FOIA review of documents involving the Kennedy assassination." The court stated that FOIA requesters could not skirt the JFK Act's procedures in order to capitalize on its substance. *See id.*

Morley maintains that the termination of Review Board operations and the creation of the MOU distinguish his case from *AARC I* because there the court rejected efforts to "secure immediate judicial application of the substantive standards of the JFK Act without having to wait for the Act's procedures to run their course." *Id.* at 1543. Now that they have, Morley asserts that the MOU should govern his request for documents. But the MOU provides its own enforcement mechanism for procuring relevant documents from the CIA; Morley can no more sidestep these procedures than he could those of the JFK Act, *see id.* at 1545. Notably, the MOU neither mentions the FOIA nor addresses the release of relevant documents to FOIA requesters; it merely provides that the appropriate records shall be released to NARA. If Morley has identified new assassination-related records, then NARA can seek their release pursuant to the MOU. To the extent that Congress sought to remedy the executive branch's overzealous shielding of assassination-related records under the FOIA, the JFK Act and the MOU supply the process by which to obtain these

documents. Morley cannot invoke this Congressional purpose to "engraft[]" "the concerns of the JFK Act . . . onto FOIA requests," *Minier v. CIA*, 88 F.3d 796, 802 (9th Cir. 1996). Accordingly, the CIA properly conceived of Morley's FOIA request as requiring application of FOIA standards, and we turn to Morley's challenges to the adequacy of the CIA's search and *Vaughn* index and to the CIA's invocation of FOIA exemptions to withhold documents.

## B. Adequacy of the Search

"[I]n adjudicating the adequacy of the agency's identification and retrieval efforts, the trial court may be warranted in relying upon agency affidavits." *Founding Church of Scientology*, 610 F.2d at 836. However, such reliance is only appropriate when the agency's supporting affidavits are "'relatively detailed' and nonconclusory and . . . submitted in good faith." *Goland v. CIA*, 607 F.2d 339, 352 (D.C. Cir. 1978) (quoting *Vaughn*, 484 F.2d at 826). "Even if these conditions are met the requester may nonetheless produce countervailing evidence, and if the sufficiency of the agency's identification or retrieval procedure is genuinely in issue, summary judgment is not in order." *Founding Church of Scientology*, 610 F.2d at 836. The district court found that Dorn's declaration "described in great detail" the CIA's actions in response to Morley's FOIA request, Mem. Op. Sept. 29, 2006 at 8, and concluded, "mindful of the deference due agency decisions in this context," *id.* at 9, that the CIA's search was adequate. The district court did not specifically address the individual contentions that Morley raises regarding the adequacy of the CIA's search. We turn to these enumerated issues.

**1. Search of Operational Files.** The CIA admits that it did not search its operational files for records responsive to Morley's request. *See* Dorn Declaration ¶ 97. Operational files are exempt from FOIA disclosure under the CIA Act, 50 U.S.C. § 431(a), and generally include records "which document the conduct of foreign intelligence or counterintelligence operations," *id*. § 431(b)(1). Morley, however, contends that

because the Senate Select Committee to Study Governmental Operations with Respect to Intelligence Activities ("Church Committee") and the House Select Committee on Assassinations ("HSCA") investigated DRE activities in 1963, his FOIA request falls under an exception in the CIA Act.

Section 431(c) of the CIA Act provides that:

> [E]xempted operational files shall continue to be subject to search and review for information *concerning* . . . (3) the specific subject matter of an investigation by the congressional intelligence committees, the Intelligence Oversight Board, the Department of Justice, the Office of General Counsel of the Central Intelligence Agency, the Office of Inspector General of the Central Intelligence Agency, or the Office of the Director of National Intelligence for any impropriety, or violation of law, Executive order, or Presidential directive, in the conduct of an intelligence activity. [emphasis added]

For exception (3) to apply, the plain text directs that three questions must be answered in the affirmative. First, does the Church Committee or the HSCA qualify as "congressional intelligence committees" under the CIA Act? The CIA does not challenge that the two committees qualify as intelligence committees, and treating the Church Committee as such appears to be consistent with congressional intent.[1] The Church

---

[1] Originally, the exception in the CIA Act provided that operational files should be searched when a FOIA request concerned "the specific subject matter of an investigation by the intelligence committees of the Congress." Pub. L. No. 98-477, § 701(c)(3), 98 Stat. 2209 (1984). The legislative history of the CIA Act indicates that the Church Committee qualifies as "intelligence committees of the congress" within the meaning of § 431(c)(3). *See* H.R. Rep. No. 98-726, at 29 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3741, 3767.

Committee was the predecessor to the Senate Select Committee on Intelligence, which is specifically named in the definition of "congressional intelligence committees," 50 U.S.C. § 401a(7); the permanent body was created on the recommendation of the Church Committee.[2] Moreover, according to evidence proffered by Morley, Congress created the HSCA to follow up on the Church Committee recommendation that Congress investigate further "why Oswald's contacts with the DRE . . . had been examined so superficially." Decl. of G. Robert Blakey, ¶¶ 9, 10. (June 27, 2006). However, it was the House Select Committee on Intelligence ("Pike Committee"), not the HSCA, that gave rise to the Permanent Select Committee on Intelligence of the House of Representatives. *See* Lt. Gerald F. Reimers II, *Foreign Intelligence Surveillance Act*, 4 J. Nat'l Security L. 55, 74 (2000). It matters not, however, that the HSCA does not necessarily fall within the definition of a congressional intelligence committee for purposes of § 431(c), for the Church Committee does and that is sufficient for the exception to apply.

Second, does Morley's request concern "the specific subject

---

However, the Intelligence Authorization Act of 2003, Pub. L. No. 107-306, § 353(b)(10), 116 Stat. 2383, 2402, struck the term "intelligence committees of the Congress" and substituted "congressional intelligence committees," defining this phrase as "(A) the Select Committee on Intelligence of the Senate; and (B) the Permanent Select Committee on Intelligence of the House of Representatives," 50 U.S.C. § 401a(7).

[2] The Church Committee Final Report states: "This experience underscores the need for an effective legislative oversight committee which has sufficient power to resolve such fundamental conflicts between secrecy and democracy." Select Committee to Study Governmental Operations with Respect to Intelligence Activities ("Church Committee"), Foreign and Military Intelligence, S. Rep. No. 94-755, Book I, at 424 (1976). The Senate Select Committee on Intelligence was established by S. Res. 400, 94th Cong., 122 Cong. Rec. 4754 (1976).

matter of an investigation by the congressional intelligence committees"? 50 U.S.C. 431(c)(3). The legislative history of the CIA Act indicates that "[t]he specificity requirement in the phrase 'specific subject matter of the investigation' tailors the scope of information remaining subject to the FOIA process to the scope of the specific subject matter of the investigation." H.R. Rep. No. 98-726, at 31 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3741, 3769. In fact, the scope of the Church Committee investigation specifically encompassed operations of the CIA and other federal agencies in investigating the assassination. *See* Church Committee, The Investigation of the Assassination of President John F. Kennedy: Performance of the Intelligence Agencies, S. Rep. No. 94-755, Book V, at 1 (1976). Significantly, the Church Committee found that "the CIA inquiry [] was deficient on the specific question of the significance of Oswald's contacts with pro- and anti-Castro groups for the many months before the assassination." *Id.* at 6. Morley proffers evidence that Joannides had access to relevant information concerning the assassination through his connections with the DRE. As the DRE's CIA case officer between 1962 and 1964 (a fact that the CIA neither denies nor confirms), Morley maintains that Joannides would have been central to the CIA's inquiry into Oswald's contacts with that particular anti-Castro group.

The CIA contends that this congressional investigation does not trigger § 431(c)(3) because it was not specifically about Joannides. *See* Appellee's Br. at 16; Oral Arg. Tape at 21:37, 22:13 (Oct. 22, 2007). This restrictive reading of the statute is foreclosed by its literal meaning. *See Gen. Dynamics Land Sys., Inc., v. Cline*, 540 U.S. 581, 600 (2004); *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). Congress chose to use the word "concerning" in § 431(c), "a broadly inclusive term," *ACLU v. Dep't of Defense*, 351 F. Supp. 2d 265, 272 (S.D.N.Y. 2005), that precludes the interpretation offered by the CIA.

In support of its proposition, the CIA relies on the only opinion by a circuit court of appeals to address § 431(c)(3). In

*Sullivan v. CIA*, 992 F.2d 1249, 1255 (1st Cir. 1993), the First Circuit held that the exception was inapplicable because "[i]t is simply not enough that information which bore in some remote way on the request surfaced in the course of an official investigation." In that case, the court addressed a FOIA request pertaining to the disappearance of the requester's father while allegedly on an airborne CIA-sponsored mission to drop propaganda over Cuba. The court construed the exception to require more than "a congressional investigation that touches on CIA conduct in a particular incident or region," *id*. at 1254. *Sullivan* addressed a situation substantially different from Morley's case. Joannides has more than a "remote" relationship to the purpose of the investigation, according to Morley's evidence, as he was the case officer for an anti-Castro group that had documented contacts with Oswald.

We hold that the requirement of § 431(c)(3) that a FOIA request concern "the specific subject matter of an investigation" is satisfied where the investigating committee would have deemed the records at issue to be central to its inquiry. This interpretation is supported by the legislative history of the CIA Act, which indicates that information that merely "surfaced in the course of the investigation" should not trigger the § 431(c)(3) exception. H.R. Rep. No. 98-726, at 31. Morley does not seek information that bears only a "remote" relationship to the investigation by the Church Committee, but rather information central to the committee's "direct investigation." *Sullivan*, 992 F.2d at 1255. The Church Committee posed a targeted inquiry investigating the performance of the intelligence agencies surrounding a particular event. The role of individual CIA officers during this event was key to such an inquiry, information that the committee would have sought out rather than merely happened upon. Even the CIA recognizes that the focus of the committee's investigation was the relationship between organizations like the DRE and the Kennedy assassination. *See* Appellee's Br. at 16. The evidence proffered by Morley indicates that Joannides was in a position of central importance to such an investigation and was thus

covered by its "specific subject matter."

Third, was the investigation "for any impropriety, or violation of law, Executive order, or Presidential directive, in the conduct of an intelligence activity"?  50 U.S.C. § 431 (c)(3). The inclusion of the word "impropriety" alongside "violation of law" suggests that Congress intended the terms to apply broadly; the misconduct need not amount to illegality.  This requirement is satisfied when a congressional investigation is spawned by alleged improprieties and seeks to uncover them.  The Church Committee investigation meets this criteria because it sought to assess the performance of the intelligence agencies in conducting their own investigations of the assassination; in fact, the Church Committee found that the CIA was "deficient" in its performance, further indicating that it was specifically investigating the possibility of CIA "impropriety."  Such an investigation implicates Joannides, who, according to Morley's proffers, was a figure central to the CIA's investigation both before and after the assassination, and someone who may have been directly implicated in the CIA's alleged deficiencies.

Language in *Sullivan* that suggests that the Church Committee did not investigate CIA "impropriety, or violation of law" was unnecessary to its holding and limited by its context. The First Circuit stated that the Church Committee's inquiry fell outside of the exception because it "was not a direct investigation into CIA wrongdoing," despite the fact that "there were instances in which the Committee searched for agency misconduct." 992 F.2d at 1255.  However, once the First Circuit concluded that information about the requester's father had only a tenuous relationship to the Church Committee's investigation, and thus did not concern "the specific subject matter of an investigation," it had no need to reach the issue of whether the Church Committee investigated CIA impropriety.  Further, *Sullivan* acknowledges that the Church Committee "considered American operations against Castro and, inevitably, their legality." *Id.*  An investigation of an illegal agency operation satisfies the dictates of § 431(c)(3), and thus our holding that the

Church Committee investigated agency "impropriety, or violation of law" is not in tension with *Sullivan*.

For these reasons, we hold that Morley's FOIA request meets the § 431(c)(3) criteria for mandating the search of the CIA's operational files under the FOIA. Because the CIA did not search these files, we remand the case to the district court so that the CIA may do so.

**2. Search of Records Released to NARA.** Morley also correctly contends that the search was inadequate because the CIA did not search records that had been transferred to NARA pursuant to the JFK Act. The Supreme Court has held that "an agency has [] 'withheld' a document under its control when, in denying an otherwise valid request, it directs the requester to a place outside of the agency where the document may be publicly available." *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 150 (1989).

The FOIA has a "settled policy" of "'full agency disclosure.'" *Tax Analysts v. U.S. Dep't of Justice*, 845 F.2d 1060, 1064 (D.C. Cir. 1988) (quoting S. Rep. No. 89-813, at 3 (1965)), *aff'd*, 492 U.S. 136. Congress has authorized only nine categories of exemption from this policy, and practical considerations that documents exist in another forum outside of the agency is not amongst them. "[A] categorical refusal to release documents that are in the agency's 'custody' or 'control' for any reason other than those set forth in the Act's enumerated exceptions would constitute 'withholding.'" *McGehee v. CIA*, 697 F.2d 1095, 1110 (D.C. Cir. 1983) (quoting *Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 150-51 (1980)). Because the CIA does not deny that it has retained copies of the records transferred to NARA and concedes that some transferred records are likely to be responsive, it was obligated to search those records in response to Morley's FOIA request.

The same holds true for the 1,100 CIA documents contained

in the protected collection at NARA. The JFK Act provides for the postponement of disclosure given "clear and convincing evidence" of enumerated circumstances requiring secrecy. JFK Act § 6; *see also id.* § 2(a)(7). The CIA confirms that "1,100 documents are located in NARA's protected collection, and will be released in 2017." Dorn Decl. ¶ 29 n.5. Although the CIA asserts on appeal that it "is not required to search these documents . . . because the 'postponed collection' under the JFK Act is not reasonably likely to contain information responsive to [Morley]'s request," Appellee's Br. at 19, this *post hoc* explanation cannot make up for the Dorn Declaration's silence. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 50 (1983). The CIA did not distinguish between the protected and unprotected records when it directed Morley to the NARA collection, instead indicating that the JFK Collection as a whole is likely to contain responsive documents. Moreover, even if the protected records could be withheld under one of the FOIA exemptions, that does not absolve the CIA of its duty to identify responsive documents, claim the relevant exemptions in the *Vaughn* index, and explain its reasoning for withholding the documents in its affidavit. Indeed, the JFK Act itself indicates that release of records to NARA does not absolve agencies of their duties under the FOIA: "Nothing in this Act shall be construed to eliminate or limit any right to file requests with any executive agency or seek judicial review of the decisions pursuant to [the FOIA]." JFK Act § 11(b).

In sum, the blanket statement in the Dorn Declaration that the CIA did not search records made available through NARA does not warrant summary judgment on this aspect of Morley's FOIA request. On remand the district court shall direct the CIA to search these documents.

**3. Search for "Missing" Documents.** Morley is less persuasive in contending that the search was inadequate because there are certain documents that he suspects the CIA has in its possession but withheld. First, Morley's FOIA request sought "[a]ll records in the Office of General Counsel pertaining to the

selection of George Joannides as liaison to the [HSCA] in May 1978." 2003 Letter at 2. Morley relies on a passage in a book written by Scott Breckinridge, the former General Counsel of the CIA, that refers to "George J." who was chosen as the agency's liaison to the HSCA. Morley also states in his sworn declaration that the CIA's meetings with Joannides "were undoubtedly memorialized by one or more of the participants." Decl. of Jefferson Morley ¶ 13 (Apr. 25, 2005). This is hardly proof that such documents exist. *See Weisberg v. U.S. Dep't of Justice*, 745 F.2d 1476, 1487 (D.C. Cir. 1984). But even if citations to Morley's own affidavit were sufficient to show that files pertaining to Joannides' selection as liaison once did exist, "failure of an agency to turn up one specific document in its search does not alone render a search inadequate." *Iturralde*, 315 F.3d at 315. Paragraph 44 of the Dorn Declaration states that the CIA directed the Office of General Counsel to search its relevant database and that responsive documents were released to Morley.

Second, Morley contends that the CIA has failed to produce the "daily diary" of its activity concerning the HSCA. Again Morley relies on his declaration and asserts in his brief that it "strains credulity" to think that the documents that he seeks do not exist. Appellant's Br. at 28. This assertion amounts to nothing more than "mere speculation that as yet uncovered documents might exist," which is not enough to "undermine the determination that the agency conducted an adequate search for the requested records." *Wilbur v. CIA*, 355 F.3d 675, 678 (D.C. Cir. 2004).

Third, Morley notes that the CIA did not disclose any of the monthly progress reports filed by Joannides while he was the case officer for the DRE. Morley relies on the fact that the monthly reports of the DRE case officers' both before and after Joannides' assignment are available at NARA. The CIA's brief explains in a footnote that it addressed these "missing" monthly reports in a memorandum to the Review Board's Executive Director: "The memorandum states that notwithstanding rather

extensive efforts, searches conducted by the Agency failed to locate any of the reports that appear to be missing [between] December 1962 [and] April 1964 and provided background which may explain the lack of such reports for this time period." Appellee's Br. at 23 n.6 (internal citations omitted).

However, the CIA's failure to provide a similar explanation in its affidavit or provide the memorandum itself to Morley makes it impracticable for the court to review the adequacy of its search. It does not suffice for purposes of summary judgment that the CIA has written a memorandum to NARA that "may explain" the lack of responsive documents; rather, the court must be able to ascertain if it *has* explained the records' absence. In *Weisberg v. U.S. Department of Justice*, 627 F.2d 365, 369 (D.C. Cir. 1980), the court stated that the FBI agent's affidavit

> assert[ed] no personal knowledge that the [record] really was discarded, so [one] permissible inference is that [the agent] is incorrect in his belief and that the [record] remains somewhere in the FBI's domain. A factual question thus persists, and it was inappropriate for the District Court to undertake to resolve it at the stage of summary judgment.

The evidence here similarly indicates that there is a factual question as to whether or not the "missing" monthly reports still exist. Although the CIA indicates these documents are responsive, it has provided neither Morley nor the court with an explanation regarding the reports' whereabouts. *Cf. Maynard v. CIA*, 986 F.2d 547, 565 (1st Cir. 1993). On remand the CIA must supplement its explanation.

**4. Search of Other Files.** The Dorn Declaration never addresses Morley's request that the CIA search its "soft files." Although the CIA states in its brief that "soft" files were included in its search, *see* Appellee's Br. at 14, this *post hoc* explanation cannot make up for the fact that the CIA provided an inadequate description of its search in its response to Morley

and in the Dorn Declaration. However, to the extent Morley also contends that the search was inadequate because the CIA failed to search records referenced in the responsive documents that were released, *Steinberg v. U.S. Department of Justice*, 23 F.3d 548, 552 (D.C. Cir. 1994), is dispositive:

> [M]ere reference to other files does not establish the existence of documents that are relevant to appellant's FOIA request. If that were the case, an agency responding to FOIA requests might be forced to examine virtually every document in its files, following an interminable trail of cross-referenced documents like a chain letter winding its way through the mail. [] FOIA clearly does not impose this burden upon federal agencies . . . .

**5.   Adequacy of CIA's Description.**   Morley is correct that the CIA failed to describe its search adequately. The Dorn Declaration does not "explain in reasonable detail the scope and method of the search conducted by the agency [sufficient] to demonstrate compliance with the obligations imposed by the FOIA." *Perry v. Block*, 684 F.2d 121, 127 (D.C. Cir. 1982). Dorn states that the "CIA produced records that were a product of a reasonable, diligent and thorough search." Dorn Decl. ¶ 43. But Dorn provides little more than conclusory adjectives and does not provide sufficient detail for the court itself to determine the search's adequacy.

The Declaration incorporates a general explanation of how the agency responds to all FOIA requests, and after describing how a single FOIA request must be divvied up between multiple component units within the CIA, Dorn states that "each component must then devise its own search strategy, which includes identifying which of its records systems to search as well as what search tools, indices, and terms to employ." *Id.* ¶ 13. But the two brief paragraphs in the Declaration explaining the search itself, Dorn Decl. ¶ 43-44, provide no information about the search strategies of the components charged with

responding to Morley's FOIA request. Dorn merely identifies the three directorates that were responsible for finding responsive documents without "identify[ing] the terms searched or explain[ing] how the search was conducted" in each component. *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). Neither does Dorn provide any indication of what each directorate's search specifically yielded. *See, e.g.*, *Nation Magazine v. U.S. Customs Serv*., 71 F.3d 885, 891 (D.C. Cir. 1995). The remainder of the Declaration describes only basic CIA policy regarding FOIA responses and a description of the CIA's correspondence with Morley. Consequently, the Declaration's terse treatment of the CIA's efforts to locate documents that were responsive to Morley's FOIA request lacks the detail "necessary to afford a FOIA requester an opportunity to challenge the adequacy of the search and to allow the district court to determine if the search was adequate in order to grant summary judgment." *Oglesby*, 920 F.2d at 68.

In view of Morley's various concerns about the adequacy of the CIA's search, and the CIA's response with a "single, conclusory affidavit," *Perry*, 684 F.2d at 128, that generally asserts adherence to the reasonableness standard, the Dorn Declaration is insufficient to carry the CIA's burden on summary judgment to "prove[] that no substantial and material facts are in dispute and that [it] is entitled to judgment as a matter of law." *Nat'l Cable Television Assoc. v. FCC*, 479 F.2d 183, 186 (D.C. Cir. 1973). On remand, the CIA must expand its description of the search it conducted. Because the CIA inadequately explained its search, we need not address Morley's objection that the court should not defer to the Dorn Declaration in view of the CIA's alleged bad faith.

### C. Adequacy of *Vaughn* index

Morley further challenges the sufficiency of the *Vaughn* index because it does not identify the specific exemption invoked to justify each redaction in the released documents. The court has provided repeated instruction on the specificity required of a *Vaughn* index. In *King v. U.S. Department of*

*Justice*, 830 F.2d 210 (D.C. Cir. 1987), the court stated that "when an agency seeks to withhold information, it must provide 'a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply,'" *id.* at 219 (quoting *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977)). The court held that a "[c]ategorical description of redacted material coupled with categorical indication of anticipated consequences of disclosure is clearly inadequate." *Id.* at 224. At the same time, in *Judicial Watch, Inc. v. Food & Drug Administration*, 449 F.3d 141, 147 (D.C. Cir. 2006), the court stated that "[w]e have never required repetitive, detailed explanations for each piece of withheld information – that is, codes and categories may be sufficiently particularized to carry the agency's burden of proof." The court observed that "[e]specially where the agency has disclosed and withheld a large number of documents, . . . particularity may actually impede court review and undermine the functions served by a *Vaughn* index." *Id.* In holding that the *Vaughn* index was adequate, the court noted the index included eleven categories of information describing the nature of each record. *Id.* at 146-47.

The Morley *Vaughn* index contains many of the same categories as in *Judicial Watch*, including an identification number, the document's subject, and the date. Although the CIA has not matched each redaction with a specific exemption, its *Vaughn* index does identify the exemptions claimed for each individual document. In *Judicial Watch* the index and the agency affidavit worked in tandem, the court validating the index because it "tied each individual document to one or more exemptions, and the [agency's] declaration linked the substance of each exemption to the documents' common elements." *Id.* at 147. The released portion of the document supplements the *Vaughn* index, so that "[t]he released content of the documents served to illuminate the nature of the redacted material." *Id.* at 145. As described below in discussing several of the claimed

FOIA exemptions, the Dorn Declaration is less fulsome in tying together the exempted documents and justifying their withholding. Still, the descriptions of the documents in the *Vaughn* index, while categorical and with little variation from page to page, convey enough information for Morley and the court to identify the records referenced and understand the basic reasoning behind the claimed exemptions. Summary judgment was therefore appropriate on the adequacy of the CIA's *Vaughn* index.

## D. Segregability

Morley notes that the district court failed to address the segregability of the withheld documents. The FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b). "[T]he District Court had an affirmative duty to consider the segregability issue *sua sponte*." *Trans-Pac. Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1028 (D.C. Cir. 1999). Thus, "a district court clearly errs when it approves the government's withholding of information under the FOIA without making an express finding on segregability." *PHE, Inc. v. Dep't of Justice*, 983 F.2d 248, 252 (D.C. Cir. 1993). The district court's failure to fulfill this responsibility requires a remand.

## E. Exemptions

**Exemption 1** provides that the disclosure provisions of the FOIA do not apply to matters that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). The CIA relies on Executive Order 12,958, "Classified National Security Information," 60 Fed. Reg. 19,825 (Apr. 17, 1995), in exempting certain material. Morley makes three points: (1) The Dorn Declaration makes only conclusory statements about national security threats under Exemption 1; (2) The passage of time since the Cold War no

longer warrants protection of documents concerning the CIA's operations in Cuba; and (3) The CIA has already released to NARA the same kind of information he seeks under the JFK Act, undercutting any potential damage to national security that the CIA currently claims.

Dorn's justification for the invocation of Exemption 1 is terse. She briefly identifies the two categories of the Executive Order under which information was classified – "intelligence activities . . . , intelligence sources or methods, or cryptology" and "foreign relations or foreign activities of the United States, including confidential sources." Dorn Decl. ¶ 48. She then restates the Executive Order's standard for classifying certain information "which reasonably could be expected to cause damage to the national security." *Id.*

Although the court has "consistently maintained that vague, conclusory affidavits, or those that merely paraphrase the words of a statute, do not allow a reviewing judge to safeguard the public's right of access to government records," *Church of Scientology of Cal., Inc. v. Turner*, 662 F.2d 784, 787 (D.C. Cir. 1980) (per curiam), the text of Exemption 1 itself suggests that little proof or explanation is required beyond a plausible assertion that information is properly classified. Morley's argument for declassification does not overcome the "*substantial weight*" the court must accord "to an agency's affidavit concerning the details of the classified status of the disputed record." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981) (emphasis in original) (internal quotation marks omitted). Furthermore, where courts have called for more detailed explanations of the potential dangers to national security that justify the use of Exemption 1, *see, e.g.*, *Oglesby v. U.S. Dep't of Army*, 79 F.3d 1172, 1184 (D.C. Cir. 1996); *Church of Scientology*, 662 F.2d at 787, they have conflated Exemption 1 and Exemption 3, which also deals with national security concerns. Upon considering the CIA's more thorough discussion of the national security implications in Exemption 3, we conclude that, taken together, the Dorn declaration made a

proper showing under Exemption 1.

As for Morley's assertion that this kind of information has already been released under the JFK Act, the only evidence he proffers is a declaration by John M. Newman, Professor of History at the University of Maryland. Notably, in *Assassination Archives & Research Center v. CIA ("AARC II")*, 334 F.3d 55, 59 (D.C. Cir. 2003), the court rejected a nearly identical declaration by Newman. In that case, the court noted that the previously disclosed material must be "as specific as" the sought material. *Id.* at 60. "Prior disclosure of similar information does not suffice; instead, the *specific* information sought by the plaintiff must already be in the public domain by official disclosure. The insistence on exactitude recognizes 'the Government's vital interest in information relating to national security and foreign affairs.'" *Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007) (emphasis in original) (citation omitted). Newman's declaration at most proves that "[a]ll of this kind of information has been revealed" under the JFK Act. Decl. of John M. Newman ¶ 9 (Mar. 5, 2006). Unable to point to specific information that was previously released and is now withheld, Morley's challenge to the CIA's reliance on Exemption 1 fails.

**<u>Exemption 2</u>** protects from disclosure records that are "related solely to the internal personnel rules and practices of an agency." 5 U.S.C. § 522(b)(2). In *Schwaner v. Department of Air Force*, 898 F.2d 793 (D.C. Cir. 1990), the court identified a two-step process for determining if records fall within Exemption 2: "'First, the material withheld should fall within the terms of the statutory language.'" *Id.* at 794 (quoting *Founding Church of Scientology of Wash., D.C., Inc. v. Smith*, 721 F.2d 828, 830 n.4 (D.C. Cir. 1983)). Second, "[i]f so, the agency may defeat disclosure by proving that either 'disclosure may risk circumvention of agency regulation,'" *id.* (quoting *Rose*, 425 U.S. at 369), "or 'the material relates to trivial administrative matters of no genuine public interest,'" *id.* at 794 (quoting *Founding Church of Scientology*, 721 F.2d at 830 n.4).

Notably, "[t]his exemption does not shield information on the sole basis that it is designed for internal agency use." *Fitzgibbon v. U.S. Secret Serv.*, 747 F. Supp. 51, 56 (D.D.C. 1990) (citing *Schwaner*, 898 F.2d at 794, 796).

The Dorn Declaration provides only a single sentence of explanation regarding the agency's reason for withholding documents under this exemption: "There is no public interest in the disclosure of such internal procedures and clerical information that would justify the administrative burden that would be placed upon CIA." Dorn Decl. ¶ 51. This statement seems to place the burden on Morley to assert a public interest before such information will be released. Indeed, the district court, after determining that the withheld information is "sufficiently related to the internal concerns of [the] agency," concluded that Morley's arguments were "unavailing" because he "failed to provide a scintilla of evidence to show how release of information pertaining to purely personnel rules and practices of the CIA . . . would shed light on the alleged activities of Mr. Oswald or the CIA's knowledge thereof." Mem. Op. Sept. 29, 2006 at 14. However, it is the agency's burden to establish that the information withheld is too trivial to warrant disclosure. *See* 5 U.S.C. 552(a)(4)(B); *Tax Analysts*, 492 U.S. at 142 n.3. The *Vaughn* index for the nine documents withheld under this exemption adds little insight into whether the type of information deemed exempt is trivial, vaguely referring only to "CIA internal organizational data" and "internal Agency regulations and practices." The CIA "has failed even to suggest any . . . reason or need to keep secret" the administrative routing information and internal data. *Fitzgibbon*, 747 F. Supp. at 57. Morley need not produce dispositive evidence that there is a public interest in this information; he need only provide evidence of a genuine issue of material fact, and in the face of the agency's complete lack of evidence regarding this exemption, he has done so. On remand the district court shall direct the CIA to supply the explanation necessary to meet its burden.

**Exemption 3** covers records that are "specifically exempted from disclosure by statute . . . provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3). The CIA explains that some records are properly withheld under the National Security Act and the CIA Act. *See* 50 U.S.C. §§ 403g, 403-1(i). Certainly, the Dorn Declaration gives a much more elaborate description on Exemption 3 than it does in relation to any other issue in the case, providing the court substantial insight into the CIA's reasons for protecting intelligence sources and methods along with other internal information. Indeed, Dorn draws causal connections between the release of certain kinds of information and the danger to national security that would result, satisfying the CIA's obligation to identify the "particularized harm that could be expected to occur from production of the requested information." *Church of Scientology*, 662 F.2d at 785.[3] This information "provide[s] the

---

[3] The Dorn Declaration includes most of the features noted in *Church of Scientology*, where

> [t]he affidavits include[d] a lengthy general discussion of the adverse consequences that could flow from releasing the information withheld. The release of any particular document, the CIA warned, could lead to one or more of the following harmful results: breaching agreements with foreign intelligence services, refusal of intelligence sources to share information in the future, revelation of intelligence-gathering methods, and disclosure of the identity of foreign or CIA intelligence operatives either directly or by inference from the content of the information. The affidavits assert that release of a message's content could lead to the revelation of its source, since certain types of information are known

kind of detailed, scrupulous description that enables a District Court judge to perform a searching *de novo* review," *id.* at 786.

Morley's assertions regarding specific documents that should have been released are to no avail. In *Ass'n of Retired Rail Road Workers v. U.S. Rail Road Retirement Board*, 830 F.2d 331, 336 (D.C. Cir. 1987), the court explained that "Exemption 3 differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents; the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage." It is particularly important to protect intelligence sources and methods from public disclosure. *See CIA v. Sims*, 471 U.S. 159, 167-69 (1985). Given the special deference owed to agency affidavits on national security matters, Morley's specific challenges to various documents are insufficient to show that summary judgment on Exemption 3 was inappropriate.

However, the CIA's unsubstantiated *Glomar* response, *see Phillippi v. CIA*, 546 F.2d 1009, 1011 (D.C. Cir. 1976), is not similarly sufficient. In response to Morley's FOIA request, the CIA stated: "With respect to that portion of your request seeking records regarding Mr. Joannides [sic] participation in any covert project, operation, or assignment, unless of course previously acknowledged, the CIA can neither confirm nor deny the existence or nonexistence of records responsive to your request." 2004 Letter at 2. The only question before the court is whether the Dorn Declaration "explained in reasonably specific detail the danger to intelligence sources and methods if the existence of responsive records were disclosed," *Wolf*, 473 F.3d at 373. Within its explanation of its withholding of

---

to be in the possession of only a few.

662 F.2d at 786.

intelligence sources under Exemption 3, the CIA asserts that "[a]n official acknowledgment of [clandestine activity] could jeopardize the source's career, family or even his life." Dorn Decl. ¶ 57. But this is the only allusion to the need for a *Glomar* response in the CIA's affidavit and it is not linked to the *Glomar* response. On remand, the CIA must substantiate its *Glomar* response with "reasonably specific detail."

**Exemption 5** excludes from mandatory release "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). The CIA withheld only two documents under this exemption.

In *Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980), the court established the standard for review of agency claims under Exemption 5: "To test whether disclosure of a document is likely to adversely affect the purposes of the privilege, courts ask themselves whether the document is so candid or personal in nature that public disclosure is likely in the future to stifle honest and frank communication within the agency." But the opacity of the CIA's explanation does not permit the court to apply the test. "[I]t is enough to observe that where no factual support is provided for an *essential* element of the claimed privilege or shield, the label 'conclusory' is surely apt." *Senate of P.R. v. U.S. Dep't of Justice*, 823 F.2d 574, 585 (D.C. Cir. 1987) (emphasis in original).

The Declaration's only statement of relevance is that "[a]s shown in the attached *Vaughn* index, CIA has properly invoked Exemption (b)(5) to withhold information protected by the deliberative-process privilege from only two documents." Dorn Decl. ¶ 85. The first document exempted under this privilege is denied in full, and the *Vaughn* index explains, "the document contains recommendations – concerning the waiver of certain reinvestigation methods – that are protected by the deliberative process privilege." The second document was partially released,

and the list of reasons for the various exemptions in the *Vaughn* index includes "material that is predecisional and deliberative in nature."

In order for the court to determine if information is "deliberative" it must "reflect the personal opinions of the writer rather than the policy of the agency." *Coastal States Gas*, 617 F.2d at 866. "Factual material that does not reveal the deliberative process is not protected by this exemption." *Paisley v. CIA*, 712 F.2d 686, 698 (D.C. Cir. 1983) (citing *EPA v. Mink*, 410 U.S. 73, 89-91 (1973)), *vacated in part on other grounds*, 724 F.2d 201 (D.C. Cir. 1984). The minimal information given in the affidavit and *Vaughn* index provide the court with no way of knowing if the CIA has properly applied this standard in exempting material from the two records identified. Moreover, "[t]o ascertain whether the documents at issue are pre-decisional, the court must first be able to pinpoint an agency decision or policy to which these documents contributed." *Id.* at 698. The CIA has provided no hint of a final agency policy its "predecisional" material preceded. According to Morley, the CIA has deleted the identities of the author and recipient in the document that was partially released, giving the court little indication about the nature of the records withheld. *See* Appellant's Br. at 50. "The identity of the parties to the memorandum is important; a document from a subordinate to a superior official is more likely to be predecisional, while a document moving in the opposite direction is more likely to contain instructions to staff explaining the reasons for a decision already made." *Coastal States Gas*, 617 F.2d at 868.

Because the Dorn declaration and *Vaughn* index fail to provide "specific and detailed proof that disclosure would defeat, rather than further, the purposes of FOIA," *Mead Data Cent.*, 566 F.2d at 258, on remand the CIA must supply at least "the minimal information necessary to make a determination," *Coastal States Gas*, 617 F.2d at 279.

**Exemption 6** provides that agencies need not disclose

"personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). "Exemption 6's requirement that disclosure be 'clearly unwarranted' instructs us to 'tilt the balance (of disclosure interests against privacy interests) in favor of disclosure.'" *Wash. Post Co. v. U.S. Dep't of Health & Human Servs.*, 690 F.2d 252, 261 (D.C. Cir. 1982) (quoting *Ditlow v. Shultz*, 517 F.2d 166, 169 (D.C. Cir. 1975)). This exemption creates a "heavy burden"; indeed, "under Exemption 6, the presumption in favor of disclosure is as strong as can be found anywhere in the Act." *Id.*

Morley does not contest that the biographical information withheld qualifies as personnel, medical, or similar files. Rather, he objects to the district court's determination that the information withheld constitutes a clearly unwarranted invasion of personal privacy. The Dorn Declaration does not sufficiently respond to this claim. After finding that the records qualify as personnel or similar files, Dorn merely assumes the exempt status of the records. Dorn states that "because its disclosure would constitute a clearly unwarranted invasion of the personal privacy of third parties, it is subject to (b)(6) protection," Dorn Decl. ¶ 87, neglecting any analysis of the "clearly unwarranted invasion" criterion. Dorn then asserts that there is "no overriding public interest" in these records. *Id.* ¶ 88. Significantly, she applies the wrong standard: "Even if some minuscule public interest could be found in disclosing the third-party information at issue, the balance would still tilt dramatically against disclosure." *Id.* ¶ 88. Dorn's circular reasoning only further highlights her failure to substantiate the asserted privacy interest: "Disclosure of this personal information would certainly violate the personal privacy of these third parties. Because the privacy interests involved will clearly outweigh the negligible public interest in disclosure, I have determined that the information should not be disclosed." *Id.* ¶ 89.

Despite its burden to show that withholding is necessary,

the CIA has failed even to articulate the privacy interest in the records, let alone demonstrate that such privacy interests meet the standard for an agency's withholding under Exemption 6. This falls well below the information provided to the court in *Judicial Watch*, which upheld withholding documents under Exemption 6. There, the court noted that the agency's declaration "fairly asserted abortion-related violence as a privacy interest for both the names and addresses of persons and businesses associated with [the abortion pill]," *id.* at 153, and balanced that privacy interest against the public interest in disclosure. To the extent the CIA suggests that the privacy interest in biographical information is self-evident, it is mistaken. In *National Ass'n of Retired Federal Employees v. Horner*, 879 F.2d 873, 877 (D.C. Cir. 1989), the court stated,

> We are thus left with circuit precedent establishing only that the disclosure of names and addresses is not inherently and always a significant threat to the privacy of those listed; whether it is a significant or a *de minimis* threat depends upon the characteristic(s) revealed by virtue of being on the particular list, and the consequences likely to ensue.

As the CIA has failed to explain the extent of the privacy interest or the consequences that may ensue from disclosure, summary judgment was inappropriate. On remand, the CIA must show that disclosure would constitute a "clearly unwarranted" invasion of personal privacy. *See Wash. Post*, 690 F.2d at 261 (quoting *Rose*, 425 U.S. at 378 n.16).

**Exemption 7(E)** protects from disclosure

> records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations

or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law.

5 U.S.C. § 552(b)(7). In its discussion of Exemption 7(E), the Dorn Declaration asserts: "The information that has been withheld could reasonably be expected to provide insight into CIA Security Center's clearance and investigatory processes, as well as certain techniques and procedures used by law enforcement agencies in coordination with CIA during those processes." Background investigations conducted to assess an applicant's qualification, such as the CIA's "clearance and investigatory processes," inherently relate to law enforcement. *See Mittleman v. Office of Pers. Mgmt.,* 76 F.3d 1240, 1243 (D.C. Cir. 1996) (per curium).

The CIA's security clearance techniques involve a general process applied to all background investigations of its officers. "[A]n agency may seek to block the disclosure of internal agency materials relating to guidelines, techniques, sources, and procedures for law enforcement investigations and prosecutions, even when the materials have not been compiled in the course of a specific investigation." *Tax Analysts v. IRS*, 294 F.3d 71, 79 (D.C. Cir. 2002). Furthermore, although the CIA only mentions that release of this information could "provide insight" into the security clearance procedure, not that it "could be expected to risk circumvention" of that procedure, we refrain from adopting an overly formalistic approach that would require the agency's response to mirror the statutory text. It is self-evident that information revealing security clearance procedures could render those procedures vulnerable and weaken their effectiveness at uncovering background information on potential candidates. Agencies must apply the correct standards when claiming FOIA exemptions, but they need not parrot the statutory language in doing so. Morley thus fails to show summary judgment in favor of the CIA was inappropriate on Exemption 7(E).

Accordingly, although the CIA properly used the FOIA as

the governing standard in responding to Morley's request for documents, presented an adequate *Vaughn* index, and supported its withholding of material pursuant to FOIA Exemptions 1, 3 and 7(E), we reverse the grant of summary judgment to the CIA and remand the case to the district court.  On remand, the district court shall direct the CIA to search its operational files and the records released to NARA and to supplement the description of its search and the explanation for withholding material pursuant to Exemptions 2, 5, and 6.  *See Campbell*, 164 F.3d at 31.  The district court also shall make the requisite segregability determination.